# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ECLIPSE RESOURCES –
OHIO, LLC, et al.,**

        **Plaintiffs,**

                                 **Case No. 2:15-cv-177**

     **v.**                         **JUDGE GREGORY L. FROST**

                                     **Magistrate Judge Terence P. Kemp**

**SCOTT A. MADZIA,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings: (1) Eclipse Resources I, LP and Eclipse Resources – Ohio, LLC's (collectively, "Eclipse") motion to dismiss amended counterclaims (ECF No. 26), Scott A. Madzia's response in opposition (ECF No. 32), and Eclipse's reply memorandum (ECF No. 33); (2) Madzia's motion for partial summary judgment (ECF No. 37), Eclipse's response in opposition (ECF No. 41), and Madzia's reply memorandum (ECF Nos. 51); (3) Eclipse's motion for leave to file sur-reply or motion for oral argument (ECF No. 52) and Madzia's response in opposition (ECF No. 54); (4) Eclipse's motion for partial summary judgment (ECF No. 58), Madzia's response in opposition (ECF No. 59), and Eclipse's reply memorandum (ECF No. 65).

For the reasons that follow, the Court **GRANTS** Eclipse's motion to dismiss, **DENIES** Madzia's motion for partial summary judgment, **DENIES AS MOOT** Eclipse's motion for leave to file a sur-reply, and **DENIES AS MOOT** Eclipse's motion for partial summary judgment.

## I.    BACKGROUND

### A.    The Madzia Unit and Madzia Wells

Plaintiff Eclipse is in the business of acquiring and developing oil and gas.  Eclipse is the successor-in-interest to the Oxford Oil Company ("Oxford"), which is a signatory to the written agreements at issue in this case.  For ease of reference, and because it is undisputed that Eclipse assumed all of Oxford's rights in the agreements at issue, the Court refers to Oxford as Eclipse in this Opinion and Order.

Defendant and counterclaimant Madzia is the individual owner of three parcels of real property in Harrison County, Ohio (the "Madzia Property").  The Madzia Property consists of approximately 128 acres of land.

On April 10, 2006, Madzia and Eclipse entered into an Oil and Gas Lease covering the Madzia Property (the "Lease").  The Lease's granting clause states:

> **GRANT OF RIGHTS AND TERM:** WITNESSETH, That the said Lessor, in consideration of the sum of One Dollar, the receipt of which is hereby acknowledged, and of the mutual covenants and agreements herein contained, does hereby grant unto the Lessee all of the oil and natural gas from any source, which includes methane produced or gathered from coal seams or other sources generally described as coalbed methane, and their constituents, in and under the lands hereinafter described, together with the exclusive rights to drill for, produce, collect, store and market oil and gas and their constituents and to inject air, gas, brine, and any other substance from any source into any subsurface strata other than potable water and minable coal strata. Lessee shall have the exclusive right to conduct geophysical, seismic and other methods of exploration for oil or gas by parties other than Lessor without the express prior written permission of the Lessee. Lessee shall have the right to transport from, across and through lands hereinafter described oil and gases and their constituents from the subject lands and other lands which right to transport shall survive the term of this lease so long as the transportation is continued. Lessee shall have the right to possess, use and occupy so much of said premises as is necessary and convenient to conduct its oil and gas and related activities, including but not limited to the right to install, maintain and replace pipelines, meters, tanks, power stations, communication facilities and other structures required to produce, store and transport oil and gases and their constituents. All of the above described rights shall extend for a term of _FIVE_ ( _5_ ) years and so much longer as oil, gas or their constituents are produced or are capable of being produced in paying quantities (in the sole opinion of Lessee) or as long as gas is stored or gas, air, brine or any other substance is injected as provided herein or operations and/or transportation is maintained on all or any part of that certain tract of land situated in:

(ECF No. 69-1, at PAGEID # 769.)  The Lease therefore grants Eclipse the oil and gas "in and under" the Madzia Property, "together with the exclusive rights to drill for . . . oil and gas and their constituents."  (*Id.*)  The Lease also grants Eclipse the right to transport oil and gas "from the subject lands and other lands" "from, across, and through" the Madzia Property.  (*Id.*)  Finally, the Lease grants Eclipse the right to "possess, use and occupy so much of said premise

as is necessary and convenient to conduct its oil and gas and related activities, including . . . the right to install . . . structures required to produce, store and transport oil and gases and their constituents."  (*Id*.)

In consideration for these rights, Eclipse agreed to pay Madzia "the sum of One Dollar, the receipt of which is hereby acknowledged," as well as a royalty on the oil and gas proceeds, free gas if certain conditions are met, and payment for damages to crops and fences caused by operations under the Lease.  (*Id*.)  The term of the Lease is "five (5) years and so much longer as oil, gas or their constituents are produced or are capable of being produced in paying quantities (in the sole opinion of Lessee) . . . ."  (*Id*.)

On March 15, 2007, Eclipse began drilling a conventional well on the Madzia Property (the "Shallow Well").  The Shallow Well was placed into production on August of 2, 2007.  Madzia has been receiving royalties from Eclipse since that date.  It is undisputed that the Shallow Well remains in production such that the Lease remains in effect.

 Madzia and Eclipse amended the Lease in June of 2013 (the "Amendment").  The Amendment states that "Lessor and Lessee for their mutual benefit, desire to amend and modify the Oil and Gas Lease, as provided for herein, in order to facilitate the formation of drilling units upon the Leased Premises and other lands."  (ECF No. 69-2, at PAGEID # 773.)  The Amendment replaces the Lease's pooling provision with a new provision that grants Eclipse the right to pool portions of the Madzia Property with other lands in order to create pooling units that exceed individual property boundaries.  *See id*. at PAGEID # 774.

At some point in late 2013, Eclipse began construction of a well pad site on the Madzia Property.  Eclipse paid Madzia approximately $60,000 to compensate for the surface damage to

3

the Madzia Property due to the well pad's construction.  The area to be drilled was a 630-acre

drilling unit that includes substantial portions of the Madzia Property, in addition to other

property (the "Madzia Unit").  Eclipse began drilling operations on the Madzia Unit on March 1,

2014.

  In April of 2014, Madzia and Eclipse executed a third agreement called the "Subsurface

Easement."  The granting clause of the Subsurface Easement states:

> NOW, THEREFORE, Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and
> other valuable consideration in hand paid to Grantor, receipt of which is hereby acknowledged, does by
> these presents GRANT, BARGAIN, AND CONVEY unto Grantee a subsurface easement and right-of-
> way to enable Grantee to drill a wellbore or wellbores across, through and under the subsurface of the
> Subsurface Tract, as to all depths and formations, and to provide Grantee ingress to and egress from, and
> the right to penetrate, use and occupy, the entire subsurface of the Subsurface Tract for a wellbore or
> wellbores. This subsurface easement and right-of-way is strictly limited in application and can only be
> used in conjunction with drilling operations on the Madzia Unit #2H well, as permitted on February 19,
> 2014 and having API Well #34-067-2-128-80-00; Madzia Unit #4H well, as permitted on February 19,
> 2014 and having API Well #34-067-2-128-70-00; Madzia Unit #6H well, as permitted on February 19,
> 2014 and having API Well #34-067-2-128-50-00; Madzia Unit #8H well, as permitted on February 19,
> 2014 and having API Well #34-067-2-128-60-00; Madzia Unit #10H well, as permitted on February 19,
> 2014 and having API Well #34-067-2-128-40-00 and for no other purpose or purposes whatsoever.

(ECF No. 8-5, at PAGEID # 105.)  The Subsurface Easement therefore grants Eclipse the right to

"drill a wellbore or wellbores across, through, and under the subsurface of the [Madzia

Property]" "in conjunction with drilling operations on the [Madzia Wells] . . . and for no other

purpose or purposes whatsoever."  (*Id*.)  The Subsurface Easement further states: "This grant

contains all of the agreements between the parties with respect to the subject matter hereof, and

no prior representations or statements, verbal or written, have been made modifying, adding to or

changing the terms of the agreement."  (*Id*.)  The Court refers to the wellbores drilled in

conjunction with the Madzia Unit as the "Madzia Wells."

### B.     The John Mills Unit and the John Mills Wells

Immediately north of the Madzia Unit is another group of drilling units called the "John Mills Units."  Eclipse presented evidence that, in November of 2013, third party Chesapeake Exploration, LLC ("Chesapeake") was planning to develop and operate four John Mills Units, which potentially included portions of the Madzia Property that were not included in the Madzia Unit.  Eclipse intended at that time to assign Chesapeake an interest in Eclipse's leaseholds in those portions of the Madzia Property.

Eclipse's Vice President of Land testified in an affidavit that Eclipse planned to backdrill the Madzia Wells.  This meant that Eclipse would drill wellbores outside of the Madzia Unit in order to capture the oil and gas inside the Madzia Unit.  Because Eclipse planned to assign Chesapeake portions of its interests in the Madzia Property that were outside of the Madzia Unit but that could include the backdrilled wellbores, it sought and obtained the Subsurface Easement. Eclipse's position, therefore, is that the Subsurface Easement was intended to preserve Eclipse's right to maintain wellbores in the Madzia Property even if it were to assign its leasehold rights to those portions of the Madzia Property to Chesapeake.  Stated differently, "a subsurface easement agreement [is] needed when portions of a property are located outside of a drilling unit, due to the possibility that future events [may] result in Eclipse no longer being the lessee of the oil and gas lease covering those parcels."  (ECF No. 41-6, at PAGEID # 502.)

The following depiction of the property boundaries and drilling units illustrates this concept.  According to Eclipse, the Subsurface Easement was necessary to preserve Eclipse's rights in the wellbores outside of the Madzia Unit (illustrated by the striped pattern) should it later give up its leasehold rights to those portions of the property:



(ECF No. 41-4, at PAGEID # 498.)

Eclipse's Field Land Coordinator (Operations), Brett Marlow, testified that he met with Madzia and the other affected property owners to explain Eclipse's need for subsurface easements in April of 2014. Marlow stated: "At no time did I ever state or explain that the subsurface easement agreement was intended to give Eclipse the right to drill and/or that the subsurface easement agreement would otherwise amend Madzia's [or the other affect property owners'] oil and gas leases with Eclipse." (ECF No. 4106, at PAGEID # 503–04.)

In May of 2014, Eclipse sought a second subsurface easement for use in conjunction with the John Mills Units ("John Mills Subsurface Easement"). Eclipse does not explain the purpose of the proposed John Mills Subsurface Easement. Eclipse states only that it "had begun negotiations to enter into a different agreement by which Eclipse would become the operator of wells drilled within the John Mills Unit." (ECF No. 41, at PAGEID # 447.) At some point, although it is unclear to the Court exactly when, Eclipse became the operator of the John Mills Wells. Eclipse separated the unit into the John Mills Unit and the John Mills West Unit.

The John Mills West Unit as initially proposed did not include any portion of the Madzia Property. Madzia refused to sign the John Mills Subsurface Easement because he would not receive a financial benefit from the same. Eclipse subsequently changed the boundary line of the John Mills West Unit to include a small portion of the Madzia Property.

At some point thereafter, it became clear that Eclipse planned to drill wellbores (the "John Mills Wells") through the Madzia Property in order to drill the John Mills West Unit from the well pad site on the Madzia Property. Madzia objected to this course of action on the ground that he never signed the John Mills Subsurface Easement. Eclipse, however, began drilling the

7

John Mills Wells on June 3, 2014.

Eclipse's position in this dispute is that it does not need the John Mills Subsurface Easement to drill the John Mills Wells because the Lease already grants Eclipse that right. Madzia's position is that the Subsurface Easement supersedes the Lease and is the operative agreement between the parties.  Because, Madzia argues, that Subsurface Easement is limited to the Madzia Unit, Eclipse's drilling of the John Mills Wells is a breach of the Subsurface Easement.

### C.     The Affidavit

The next issue in dispute involves an affidavit that Eclipse submitted to the Ohio Department of Natural Resources ("ODNR") (the "Affidavit").  Madzia executed the Affidavit stating that he owns the coal rights on the Madzia Property and that he has no objections to the drilling of the Madzia Wells.  Eclipse submitted the Affidavit to ODNR in order to obtain a permit to drill the Madzia Wells.  Madzia alleges that, "[i]n order to obtain a drilling permit from the [ODNR] for the John Mills Wells, the Eclipse Entities improperly, and without Madzia's knowledge or consent, submitted [the Affidavit that] Madzia had signed solely to allow the Eclipse Entities to obtain permits for the Madzia Wells."  (ECF No. 25 ¶ 33.)

### D.     The Parties' Claims

Eclipse filed suit against Madzia on January 20, 2015.  In its amended complaint, Eclipse requests a declaratory judgment that it can drill, complete, and otherwise operate the John Mills Wells from the well pad on the Madzia Property.  Eclipse also asserts a claim for breach of contract on the ground that Madzia breached the Lease by threatening litigation to prevent Eclipse from drilling and by breaching his duty to act in good faith with respect to the Lease.

8

Eclipse initially alleged in its complaint that it "learned that a new Oil and Gas Affidavit is required [to drill the John Mills Wells] and that landowner authorization is needed for the specific well that is the subject of the Application for Permit."  (ECF No. 1 ¶ 40.)  Eclipse asserted a claim for specific performance of contract in order to obtain a new affidavit from Madzia regarding the John Mills Wells.  Eclipse subsequently dropped that claim because "[ODNR] is no longer requiring [it] to submit the [Affidavit]."  (ECF No. 66, at PAGEID # 738.)  Eclipse's amended breach of contract claim, however, still alleges that Madzia breached the Lease and Amendment "by failing to execute the second Oil and Gas Affidavit required by the ODNR."  (ECF No. 69 ¶ 47.)

Neither party has filed a motion with respect to Eclipse's claims.  The Court therefore does not address those claims in this Opinion and Order.

Madzia filed several counterclaims against Eclipse.  Those claims are:

- Count I: Trespass against Eclipse[1] for entering the Madzia Property "without authority, over the express objections of Madzia, and without a valid or legal right to do so" and using "the surface of the well pad site on Madzia's Property and the subsurface of Madzia's Property . . . for the purpose of . . . drilling wellbores for oil and gas exploration and extracting oil, gas, or other minerals from the Property and in relation to the John Mills Wells" (ECF No. 25 ¶ 38)

- Count II: Declaratory relief that the Lease and Amendment do not expressly grant Eclipse the right to drill a wellbore across, through, or under the subsurface of the Madzia property for the John Mills Wells and that Eclipse is obligated to indemnify Madzia for the costs of defending this lawsuit and pursuing his counterclaims

- Count III: Breach of the Lease and Amendment by "improperly recycling the

---

[1] Madzia asserted a trespass claim against Defendant XTO Energy, Inc. ("XTO"), which filed a response in opposition to Madzia's motion for summary judgment.  Madzia subsequently clarified that he is not moving for summary judgment on any claims asserted against XTO at this time.  The Court therefore does not consider the claims against XTO in this Opinion and Order.

Coal Affidavit to obtain permits for the John Mills Wells and thereby violating Ohio law and/or the rules and regulations of the [ODNR]" (*id.* ¶ 59)

- Count VI: Breach of Subsurface Easement by "improperly recycling the Coal Affidavit to obtain permits for the John Mills Wells . . . and thereby violating Ohio law and/or the rules and regulations of the [ODNR]" (*id.* ¶65) and by "using the rights granted [under the Subsurface Easement] for a purpose other than drilling the Madzia Wells" (*id.* ¶ 66)

- Count V: Breach of the covenant of good faith and fair dealing of the Lease, Amendment, and Subsurface Easement by fracking wells in which Madzia does not have an interest before fracking those in which he does have an interest in retaliation for refusing to sign the John Mills Subsurface Easement, by pooling a portion of the Madzia Property into the John Mills West Unit in bad faith, by recycling the Coal Affidavit in order to obtain a permit to drill the John Mills Wells, and by drilling the John Mills Wells without contractual authority to do so

- Counts VI and VII: Promissory estoppel on the ground that Eclipse promised in the Subsurface Easement "that the well pad site located on Madzia's Property would be exclusively used for the purpose of exploring, drilling, and extracting oil, gas, and other minerals from the Madzia Wells and for no other purpose or purposes whatsoever," (*id.* ¶¶ 85, 88), to Madzia's detriment and to the unjust benefit of Eclipse

- Count VIII: Slander of title on the ground that Eclipse misleadingly filed the Affidavit in order to obtain permits for the John Mills Wells

- Count IX: Fraud on the ground that Eclipse represented that the Affidavit would only be used to obtain permits for the Madzia Wells, when in fact Eclipse used the Affidavit to obtain permits for the John Mills Wells

- Count X: Tortious interference with prospective business relations on the ground that Madzia could have entered into business relationships with other entities willing to extract the oil and gas from the Madzia Property, but was prevented from doing so as a result of Eclipse's conduct

- Count XI: Injunction to prevent further drilling of the John Mills Wells

Eclipse moved to dismiss each of Madzia's counterclaims.  Madzia then moved for

summary judgment on a portion of his claim for declaratory judgment (that Eclipse lacks the

10

contractual authority to drill the John Mills Wells) and on his trespass claim against Eclipse.

Eclipse moved to file a sur-reply in support of its memorandum in opposition to Madzia's

motion for summary judgment.  Eclipse then cross-moved for summary judgment on Madzia's

declaratory judgment claim and moved for summary judgment on a limited portion of Madzia's

claim for breach of the implied covenant of good faith and dealing.  The Court will address the

parties' arguments below.

## II.     LAW AND ARGUMENT

### A.     Declaratory Judgment (Count II of Counterclaim)

Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, . .

. any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration . . . ."  Courts in this

circuit consider five factors to determine whether declaratory relief is appropriate:

> (1) whether the declaratory action would settle the controversy; (2) whether the
> declaratory action would serve a useful purpose in clarifying the legal relations in
> issue; (3) whether the declaratory remedy is being used merely for the purpose of
> "procedural fencing" or "to provide an arena for a race for res judicata;" (4)
> whether the use of a declaratory action would increase friction between our
> federal and state courts and improperly encroach upon state jurisdiction; and (5)
> whether there is an alternative remedy which is better or more effective.

*Grand Trunk W.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

Here, as stated above, Count II of Madzia's counterclaim seeks a declaratory judgment

that: (1) the Lease and Amendment do not expressly grant Eclipse the right to drill the John Mills

Wells across, through, or under the subsurface of the Madzia Property, and (2) Eclipse must

indemnify Madzia for the costs of participating in this lawsuit.  Eclipse moves to dismiss this

claim.  Madzia seeks summary judgment on the first aspect of this claim.

11

The Court agrees with the parties that declaratory relief is necessary to settle this controversy.  The Court will address each aspect of Count II of the counterclaim in turn.

1.  Eclipse's contractual right to drill the John Mills Wells through the Madzia Property

It is axiomatic that the rights and remedies of the parties to an oil and gas lease must be determined by the terms of the written instrument.  *Harris v. Ohio Oil Co*., 57 Ohio St. 118, 128, 48 N.E. 502 (1897).  Standard rules of contract interpretation apply.  That is:

> Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co*., 990 F.2d 854, 858 (6th Cir.1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc*., 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc*., 15 Ohio St.3d 321, 474 N.E.2d 271, 272–73 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty. Bd. of Commrs*., 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co*., 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *accord State ex. rel Petro v. R.J. Reynolds Tobacco Co*., 104 Ohio St.3d 559, 820 N.E.2d 910, 915 (2004). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 875 N.E.2d at 566; *accord Alexander v. Buckeye Pipe Line Co*., 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). However, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952; *accord R.J. Reynolds*, 820 N.E.2d at 915. Nevertheless, a court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261–62 (2003).

Contractual language is ambiguous "only where its meaning cannot be determined

12

from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (2003) (quoting Potti, 938 F.2d at 647); *see also King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (1988); *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 716 N.E.2d 1201, 1208 (1998). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co.*, 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (2002) (quoting *Equitable Life Ins. Co. of Iowa v. Gerwick*, 50 Ohio App. 277, 197 N.E. 923, 926 (1934)), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (1995); *see also Burris v. Grange Mut. Co.*, 46 Ohio St.3d 84, 545 N.E.2d 83, 88 (1989) ("The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." (quoting *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 462 N.E.2d 403, 406 (1984))). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander*, 374 N.E.2d at 150.

If the language in the contract is ambiguous, the court should generally construe it against the drafter. *See Central Realty Co. v. Clutter*, 62 Ohio St.2d 411, 406 N.E.2d 515, 517 (1980); *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003) (applying Ohio law). In particular, "where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the non-drafting party." *Westfield*, 797 N.E.2d at 1261. However, this contra proferentem rule does not allow a court to adopt an unreasonable interpretation of the contract. *Id.* (citing *Morfoot v. Stake*, 174 Ohio St. 506, 190 N.E.2d 573, 574 (1963)). Indeed, the purpose of the contra proferentem rule is to provide a means of determining which of two reasonable contractual interpretations should control. *See* Restatement (Second) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." (emphasis added)).

*Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763–764 (6th Cir. 2008).

The analogous case of *Columbia Gas Transmission Corp. v. Ogle* informs the Court's

analysis on this issue.  51 F. Supp. 2d 866 (S.D. Ohio 1997).  In *Columbia Gas*, a company entered into an oil and gas lease with individual property owners that enabled it (the company) to drill for and store oil on the individuals' property.  *Id*. at 868.  When the company attempted to drill its first well, the individuals requested a pipeline from the well to their house.  *Id*. at 869.  The company agreed, and the parties entered into a "right-of-way" agreement for purposes of laying the pipeline.  *Id*.  A notation on the right-of-way agreement suggested that the company would be limited to building only one well, which contradicted its rights in the original lease (which did not limit the number of wells).  *Id*. at 870.  The individuals later argued that the right-of-way agreement superseded the lease with respect to this issue and that the company was precluded from building more than one well on the property.  *Id*.

The court began its analysis by stating that the original lease granted the company the right to build multiple wells on the individuals' property.  *Id*. at 871.  The question, therefore, was whether the subsequent right-of-way agreement modified the lease.  *See id*.  Noting that "[m]odification cannot be presumed, it must be clearly manifested by the action of both parties to the contract," *id*.  (quoting *County Savings Bank v. Sain*, 1992 WL 82794, 1992 Ohio App. LEXIS 2179 (Franklin Co. Ohio App. 1992)), the court found that "the right-of-way agreement does not clearly manifest an intent to modify the lease[; i]ndeed, the right-of-way agreement contains no reference whatsoever to the lease."  *Id*.  The court concluded that the notation about building only one well "can only refer to the rights granted by the right-of-way, which are limited to the right to lay a pipeline over and through the premises."  *Id*.

The Sixth Circuit affirmed the district court's decision.  172 F.3d 47 (6th Cir. 1998). Like the district court, the Sixth Circuit began its analysis by noting that "the original lease

14

clearly and unambiguously contains no limitation on the number of wells." *Id*. at *3.  The court went on to state that "[a] subsequent agreement does not modify unambiguous terms in a preceding contract unless the subsequent agreement specifically evidences an intent to do so." *Id*. (citing *Trinova Corp. v. Pilkington Bros*., 70 Ohio St. 3d 271, 638 N.E.2d 572, 576 (Ohio 1994)).  Because the court agreed with the district court that the right-of-way contract did not specifically evidence an intent to modify the lease, it affirmed the district court's judgment in favor of the company.  *See id*. at *4.

Turning to the facts of the present case, the Court begins its analysis by analyzing the Lease and Amendment.  The Lease unambiguously grants Eclipse the right to "transport . . . oil and gas and their constituents from . . . other lands" "from, across, and through" the Madzia Property and to "possess, use and occupy so much of [the Madzia Property] as is necessary and convenient to conduct its oil and gas related activities . . . including . . . the right to install . . . structures required to . . . transport oil and gases" (hereinafter referred to as the "Transport Provisions").  (ECF No. 69-1, at PAGEID # 769.)  The Amendment does not modify or affect this right.

Eclipse argues that the Transport Provisions grant it the right to transport oil and gas from other lands (such as the lands constituting the John Mills West Unit) across and through the Madzia Property and to drill wellbores through the subsurface of the Madzia Property for that purpose.  Eclipse asserts that the Lease's plain language is unambiguous on this point.

Madzia offers only one counterargument regarding the Lease's plain language.  Madzia states that the Lease gives Eclipse the right to "transport" oil and gas across the Madzia Property, but "[does] not grant the Eclipse Entities the right to drill wellbores through the subsurface of the

15

Property in connection with wells located on other property." (ECF No. 32, at PAGEID # 323.) Although not clearly stated, Madzia's argument appears to be that the Lease sets forth Eclipse's rights with respect to the surface of the Madzia Property and not the subsurface.

Madzia's argument fails. The Lease unequivocally applies to Eclipse's rights "in and under" the Madzia Property. (ECF No. 691, at PAGEID # 769.) The Lease then sets forth Eclipse's right to drill for oil and gas located under the surface of the Madzia Property. (*Id*.) Indeed, it would be illogical for an oil and gas lease to grant only surface rights to a lessee. *See, e.g.*, *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St. 3d 490, --N.E.3d--, 2015-Ohio-4551, at ¶ 21 ("Through a lease, the owner of the mineral estate, whether or not also the owner of the surface estate, may convey to another the rights to the minerals that lie beneath the surface."). Madzia does not cite any authority in support of his position on this issue.

Because the Lease defines Eclipse's rights with respect to the surface and subsurface of the Madzia Property, it follows that the Transport Provisions grant Eclipse the rights it claims. The plain language of these provisions allows Eclipse to transport oil and gas from lands outside the Madzia Property (including those encompassed in the John Mills West Unit) through the subsurface of the Madzia Property. *See* ECF No. 69-1, at PAGEID # 769. The plain language further grants Eclipse the broad right to take any action necessary to achieve this purpose, *see id*., which includes the right to drill wellbores through the subsurface of the Madzia Property. Madzia's argument that the Lease is ambiguous on this issue is unsupported and ignores the broad rights that the plain language of the Lease conveys.

Having found that the Lease is unambiguous on this point, the Court is constrained to apply the Lease's plain language. *See Savedoff*, 524 F.3d at 763. The Court may not use

16

extrinsic evidence, such as the facts that Eclipse sought the Subsurface Easement and the John Mills Subsurface Easement, or that the Subsurface Easement states that it "enables" Eclipse to drill a wellbore through the Madzia Property for use in drilling the Madzia Wells, to create an ambiguity. *Id.*

The crux of Madzia's argument—that Eclipse would not have sought the Subsurface Easement or the John Mills Subsurface Easement if it already had the right to drill wellbores through the subsurface of the Madzia Property—therefore fails. Eclipse's motivation in seeking the Subsurface Easement and John Mills Subsurface Easement cannot alter the unambiguous language of the Lease.

Having found that the Lease authorizes Eclipse to transport oil and gas from the John Mills Wells through the well pad on the Madzia Property, the issue becomes whether the Subsurface Easement modifies that right. Madzia argues that the Court should ignore the Lease and focus only on the Subsurface Easement, which (according to Madzia) is a fully-integrated contract that represents the entire agreement between the parties regarding Eclipse's "rights in the subsurface of the [Madzia] Property." (ECF No. 37, at PAGEID # 410.) Stated differently, Madzia argues that the Subsurface Easement was intended to modify the Lease with respect to Eclipse's subsurface rights.

The issue for the Court is whether the Subsurface Easement "specifically evidences an intent" to modify the Lease. *Columbia Gas*, 172 F.3d at *3. The Court finds no such intent within the four corners of the document. As in *Columbia Gas*, here, the Subsurface Easement does not reference the Lease and does not expressly state that it is modifying the same. *See* 51 F. Supp. 2d at 871. There "is no reasonable interpretation of [the] language [in the Subsurface

17

Easement] that can clearly establish that the parties shared a mutual intent to modify the original lease." *Id*.

Moreover, the rights granted by the Subsurface Easement, like the right-of-way agreement in *Columbia Gas*, are fundamentally different than the rights granted by an oil and gas lease. *Cf. id*. ("The right-of-way says nothing about the right to drill gas wells or conduct geological tests or surveys on defendants' property."); *see also Easement*, Black's Law Dictionary (10th ed. 2014) ("Unlike a lease or a license, an easement . . . does not give the holder the right to possess, take from, improve, or sell the land.").  Unlike the Lease, the Subsurface Easement says nothing about Eclipse's right to collect oil and gas from the subsurface of the Madzia Property.  In fact, the Subsurface Easement makes clear that "this agreement is a subsurface easement and right-of-way only and in no way grants or conveys any part of the underlying fee simple estate of any lands owned by grantor."  (ECF No. 8-5, at PAGEID # 106.)

Madzia's argument that "[t]he subject matter of the Subsurface Easement is the Eclipse Entities' rights in the subsurface of the Property," (ECF No. 37, at PAGEID # 410), cannot stand in light of this limitation.  If the Subsurface Easement modified the Lease with respect to Eclipse's subsurface rights in the Madzia Property, but did not grant or convey the oil and gas rights in the same, then Eclipse would be precluded from producing oil and gas from the Madzia Unit.  But Madzia acknowledges that Eclipse still has the right to drill the Madzia Unit pursuant to the Lease.  It would be illogical to conclude that the Subsurface Easement was intended to modify the Lease with respect to Eclipse's subsurface rights in the Madzia Property while at the same time concluding that the Lease remains in force with respect to Eclipse's right to drill for and produce oil and gas from the subsurface of the Madzia Property.

18

In his reply in support of his motion for summary judgment, Madzia concedes that the Subsurface Easement cannot supersede the Lease and Amendment with respect to Eclipse's subsurface rights in the Madzia Property.  *See* ECF No. 51, at PAGEID # 594 n.5.  Instead, Madzia argues, the Subsurface Easement modifies the Lease by limiting Eclipse's right to drill wellbores through the subsurface of the Madzia Property.

This argument similarly fails.  Regardless of how Madzia attempts to define the Subsurface Easement's subject matter, the fact remains that the Subsurface Easement does not reference the Lease or state that it is modifying the same.  Madzia's argument also ignores the exchange of rights set forth in the plain language of the Subsurface Easement.  The document states that it grants Eclipse an easement in exchange for "the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid to Grantor, receipt of which is hereby acknowledged." (ECF No. 8-5, at PAGEID # 105.)  Nothing in this language suggests that the parties bargained in the Subsurface Easement to limit rights that Eclipse received under the Lease.

Madzia attempts to force this limitation into the document by pointing to the following language: "This subsurface easement and right-of-way is strictly limited in application and can only be used in conjunction with drilling operations on the [Madzia Wells] and for no other purpose or purposes whatsoever."  (ECF No. 8-5, at PAGEID # 105.)  Madzia asserts that his attorney added this "for no other purpose or purposes whatsoever" language into the agreement in order to limit Eclipse's right to drill wellbores in conjunction with drilling units other than the Madzia Unit.  Madzia suggests that, unless the Court accepts his interpretation of the quoted language, the Subsurface Easement does not represent a *quid pro quo*.

The plain language of the document does not support this argument.  To the contrary, as

19

stated above, the Subsurface Easement states that it is supported by "consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid to Grantor, receipt of which is hereby acknowledged."  (ECF No. 8-5, at PAGEID # 105.)  Nothing about the "for no other purpose or purposes whatsoever" language suggests that the real consideration for the Subsurface Easement is a mutual intent to modify the Lease by restricting Eclipse's right to drill wellbores through the Madzia Property.  Indeed, the very fact that Madzia's attorney added that language during the parties' negotiations is extrinsic evidence that the Court cannot consider given the unambiguous nature of the contract.  *See Savedoff*, 524 F.3d at 763.

Within the four corners of the document, the "for no other purpose or purposes whatsoever" language serves only to limit the extent to which Eclipse can rely on the Subsurface Easement as authorization to drill wellbores.  Eclipse does not argue that the Subsurface Easement grants it the right to drill the wellbores at issue in this case.[2]  As such, the "for no other purpose or purposes" language is irrelevant to the Court's analysis.

Madzia further argues that the Subsurface Easement states that it "covers" all of the Madzia Property such that it must modify the Lease.  (ECF No. 8-5, at PAGEID # 105.)  But this argument does not address any of the above-stated points.  The fact that the Subsurface Easement "covers" the Madzia Property does not, itself, specifically evidence an intent to modify the Lease.

Because the Subsurface Easement does not evince an intent to modify the Lease, its

---

[2] In Count IV of his counterclaim, Madzia alleges that "Eclipse LP has breached the Subsurface Easement by, among other things, using the rights granted thereunder for a purpose other than drilling the Madzia Wells." (ECF No. 25 ¶ 66.)  But Eclipse has never relied on the Subsurface Easement as the source of its authority to drill the John Mills Wells.  To the contrary, Eclipse's position has consistently been that its right to drill the John Mills Wells through the well pad on the Madzia Property stems from the Lease.  Madzia's allegation therefore cannot form the basis of a claim for breach of the Subsurface Easement.

20

application must be limited to the specific subject matter to which it refers. *Cf. Columbia Gas*, 51 F. Supp. at 871 (limiting the language in the right-of-way agreement to the specific pipeline at issue in that agreement). By its terms, the subject matter of the Subsurface Easement is Eclipse's right to drill wellbores in conjunction with the drilling operations on the Madzia Unit. The Subsurface Easement is fully integrated with respect to this limited subject matter. This means that the parties cannot rely on extrinsic evidence to suggest that they intended to reach a different agreement regarding Eclipse's right to drill wellbores in conjunction with the Madzia Unit. The fact that the Subsurface Easement is fully integrated does not, as Madzia claims, place any restrictions on Eclipse's rights under the Lease that are outside the scope of the Subsurface Easement.

The subject matter at issue in this case (Eclipse's right to drill wellbores in conjunction with drilling operations on the John Mills West Unit) is outside the scope of the Subsurface Easement. The Lease therefore is the operative document on this issue. The Court has already concluded that the Lease grants Eclipse the right to drill wellbores through the Madzia Property in order to use and transfer oil and gas from other lands such as those constituting the John Mills West Unit. As such, the Court agrees with Eclipse that it is entitled to a declaratory judgment regarding its right to drill the John Mills Wells from the well pad on the Madzia property.

The Court accordingly **GRANTS** Eclipse's motion to dismiss and **DENIES** Madzia's motion for summary judgment on this aspect of Count II of the counterclaim.

### 2. Indemnification

The remaining aspect of Count II of the counterclaim relates to the Subsurface Easement's indemnification provision. That provision states:

> Grantee, its successors and assigns, shall and hereby does indemnify and hold harmless Grantor from and against all liability, damages, suits, actions, costs and expenses of whatsoever nature (including reasonable attorneys' fees) to persons or property caused by or arising out of any of Grantee's operations hereunder or otherwise relating to the subsurface easement and right-of-way, except where such claims result from the acts, omissions and negligence of Grantor.

(ECF No. 8-5, at PAGEID # 106.)

Having found that the Lease authorizes Eclipse to drill the John Mills Wells from the well pad on the Madzia Property, any damages Madzia suffered in attempting to prevent the same (including pursuing Count II of his counterclaim) are damages of his own making.  Stated differently, any such damages result from Madzia's acts.  The plain language of the indemnification provision therefore does not apply to the facts of this case.

The Court accordingly **GRANTS** Eclipse's motion to dismiss Count II of the counterclaim in its entirety.

### B.        Trespass Claim (Count I of Counterclaim)

Madzia alleges that Eclipse trespassed on his property by using the well pad on the Madzia Property and the subsurface of the Madzia Property to drill the John Mills Wells. Specifically, Madzia argues that Eclipse trespassed on his property by exceeding the authority set forth in the parties' agreements.  This claim is entirely dependent on Madzia's proposed interpretation of the Subsurface Easement that the Court rejected above.

Because the Lease authorizes Eclipse to drill the John Mills Wells through the Madzia Property, the Court necessarily concludes that Eclipse did not exceed its authority by doing so. Madzia's trespass claim therefore fails.  The Court **GRANTS** Eclipse's motion to dismiss this claim and **DENIES** Madzia's motion for summary judgment on this claim.  Madzia's motion for partial summary judgment, therefore, is **DENIED** in its entirety.  (ECF No. 37.)  Because the

22

Court need not address Madzia's argument that Eclipse lacked authority to drill horizontal Utica wells pursuant to the Lease and Amendment, the Court **DENIES AS MOOT** Eclipse's motion for leave to file a sur-reply to Madzia's motion for summary judgment in order to address this argument.  (ECF No. 53.)

### C.      The Affidavit and Related Claims

The Court next addresses Madzia's claims regarding the Affidavit.  A brief background of the statute at issue is necessary to put these claims in context.

The process of drilling an oil and gas well can impact coal mines located in the area in which the well is drilled.  For that reason, Ohio Revised Code § 1509.08 sets forth a procedure for obtaining a permit to drill an oil and gas well if the same is to be located in a coal bearing township.  Section 1509.08 states, in relevant part:

> Upon receipt of an application for a permit required by section 1509.05 of the Revised Code, or upon receipt of an application for a permit to plug and abandon under section 1509.13 of the Revised Code, the chief of the division of oil and gas resources management shall determine whether the well is or is to be located in a coal bearing township.

> Whether or not the well is or is to be located in a coal bearing township, the chief, by order, may refuse to issue a permit required by section 1509.05 of the Revised Code to any applicant who at the time of applying for the permit is in material or substantial violation of this chapter or rules adopted or orders issued under it. The chief shall refuse to issue a permit to any applicant who at the time of applying for the permit has been found liable by a final nonappealable order of a court of competent jurisdiction for damage to streets, roads, highways, bridges, culverts, or drainways pursuant to section 4513.34 or 5577.12 of the Revised Code until the applicant provides the chief with evidence of compliance with the order. No applicant shall attempt to circumvent this provision by applying for a permit under a different name or business organization name, by transferring responsibility to another person or entity, by abandoning the well or lease, or by any other similar act.

> If the well is not or is not to be located in a coal bearing township, or if it

23

is to be located in a coal bearing township, but the landowner submits an affidavit attesting to ownership of the property in fee simple, including the coal, and has no objection to the well, the chief shall issue the permit.

O.R.C. § 1509.08.  The process therefore allows the entity seeking to build a well to go through a permit process that provides an opportunity for the affected coal owner to object to the proposed well.  If the coal owner objects, "and if in the opinion of the chief the objection is well founded, the chief shall disapprove the application and immediately return it to [ODNR] together with the reasons for disapproval and a suggestion for a new location for the well."  *Id*.  The entity seeking to build the oil and gas well can bypass this process by submitting an affidavit from the landowner stating that he or she has no objections to the proposed well.  *See id*.  The language and structure of the statute suggests that the coal owner's objection must relate to the well's impact on his or her coal rights such that ODNR would find the objection "well founded" and suggest a new location for the well.  Nothing about the statute suggests that it is intended to resolve contractual disputes between a landowner and an oil and gas company regarding the latter's contractual right to drill.

Importantly for purposes of this case, the statute does not require an oil and gas company to submit an affidavit from the landowner (as opposed to going through the permit process).  The statute similarly does not create a violation for submitting an affidavit expressing the landowner's consent to drill a different oil and gas well.  To the contrary, the statute allows an entity to submit an affidavit from the landowner stating that he or she does not object to the proposed well.  If, as in this case, the entity submits an affidavit expressing the landowner's consent to build a different well, then the statute has not been satisfied and the language requiring ODNR to issue the permit does not apply.  It does not logically follow that an entity

24

that submits such an affidavit has affirmatively violated the statute.

The Affidavit at issue in this case is attached to Eclipse's initial complaint.[3] The Affidavit states that Madzia owns the property at issue, including the coal rights, and that he has "no objections to the drilling of the [Madzia Wells] by [Eclipse] on said premises." (ECF No. 1-4, at PAGEID # 40.) Madzia alleges that Eclipse wrongfully submitted this Affidavit to ODNR in an attempt to obtain a permit for the John Mills Wells.

Madzia does not allege that the Affidavit caused ODNR to issue the permit for the John Mills Wells. Madzia does not allege that, had Eclipse applied for a permit instead of submitting the Affidavit, he would have had any objections to the applications that ODNR would have considered "well founded" enough to suggest an alternative location for the John Mills Wells. Madzia does not allege that Eclipse attempted to alter the plain language of the Affidavit to include a reference to the John Mills Wells, or that ODNR was otherwise misled as to the nature of the Affidavit. In short, Madzia does not allege that the Affidavit had any impact on the permit process whatsoever.

Madzia's counterclaims involving the Affidavit fail to state a claim for relief. The basis of Counts III and IV is that Eclipse agreed in the Lease and the Subsurface Easement to comply with all applicable laws and regulations relative to its operations on the Property and that, by submitting the Affidavit to ODNR in an attempt to obtain a permit for the John Mills Wells, Eclipse failed to comply with state law and therefore breached the contracts. But as stated

---

[3] Although Eclipse subsequently amended its complaint to drop the specific performance claim as well as the attached Affidavit, both the amended complaint and Madzia's counterclaim assert claims based on the Affidavit. The Court therefore will consider the same in adjudicating Eclipse's motion to dismiss. *See Basset v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (holding that a court analyzing a Rule 12(b)(6) motion may consider the complaint, public records, and documents central to the claim that are referenced in the complaint).

above, Madzia has not alleged any way in which Eclipse failed to comply with state law. Madzia therefore fails to allege a plausible claim for breach of the Lease, the Amendment, and/or the Subsurface Easement.  The Court accordingly **GRANTS** Eclipse's motion to dismiss these claims.

Madzia asserts in Count VIII that Eclipse slandered the title to his property by "fraudulently using the Coal Affidavit to obtain the John Mills Wells."  (ECF No. 32, at PAGEID # 334.)  As stated above, however, Madzia does not allege that Eclipse was successful in obtaining a permit on the basis of the Affidavit, that Eclipse misrepresented the nature of the Affidavit to the ODNR, or that Eclipse's "implicit statement" that Madzia did not object to the John Mills Wells constitutes the "publication of a slanderous statement" necessary to state a slander of title claim.  (ECF No. 32, at PAGEID # 334.)  Count VIII therefore has no legal basis. The Court **GRANTS** Eclipse's motion to dismiss this claim.

Madzia alleges a fraud claim in Count IX.  Madzia argues that Eclipse committed fraud by representing to him at the time he signed the Affidavit that it would only be used in conjunction with the Madzia Wells.  Madzia does not, however, allege that Eclipse knew at the time it made this representation that it would attempt to use the Affidavit to secure a permit for the John Mills Wells in addition to the Madzia Wells.  Madzia therefore fails to allege facts suggesting that Eclipse knew its representation was false.  Madzia's claim fails for the additional reason that he does not allege a plausible link between Eclipse's conduct in submitting the Affidavit to ODNR, the fact that Eclipse ultimately drilled the John Mills Wells, and any alleged damage to coal on the Madzia Property.  The Court accordingly **GRANTS** Eclipse's motion to dismiss this claim.

26

Madzia's claim for an injunction (Count XI) likewise fails to state a claim.  Madzia's asserted basis for injunctive relief is that Eclipse lacks the contractual authority to drill the John Mills Wells and that the drilling operations on the John Mills Wells are illegal because they were "performed under authority of a permit that was issued with an unauthorized and invalid affidavit."  (ECF No. 25 ¶ 117.)  The Court rejected the first portion of this allegation in Section II(A) above.

The remaining portion of this allegation fails because Madzia does not allege facts to suggest that the Affidavit was "unauthorized" or "invalid."  Madzia acknowledges that the document itself is a valid affidavit that he signed.  Although Madzia takes issue with Eclipse's conduct in submitting the Affidavit to ODNR for a second time, such conduct does not "invalidate" the Affidavit.  The crux of Madzia's claim is that Eclipse falsely suggested to ODNR that he (Madzia) consented to the John Mills Wells by submitting the Affidavit to ODNR for the second time.  But there is no allegation that ODNR accepted this suggestion and wrongfully issued the permit on this basis.  In fact, Eclipse alleged in its initial complaint that ODNR rejected the Affidavit and informed Eclipse that it must submit a new affidavit specific to the John Mills Wells in order to bypass the permit process.  Madzia does not allege or explain how the permit came to be issued, the basis for the same, and how it was "unauthorized" or "invalid."  The Court accordingly **GRANTS** Eclipse's motion to dismiss Count XI of Madzia's counterclaim.

### D.    Counts VI and VII, and Count X

Counts VI (promisorry estoppel) and VII (unjust enrichment) fail to state a claim for relief.  The unjust enrichment claim is premised on the notion that Eclipse obtained a benefit by

27

drilling the John Mills Wells from the well pad on the Madzia Property for which Madzia was not compensated. This claim cannot stand, however, in light of the Court's determination that the Lease authorizes Eclipse to take such action. The consideration set forth in the Lease is the benefit Madzia received in exchange for the benefits granted to Eclipse. The benefit to Eclipse was not "unjust" within the meaning of an unjust enrichment claim.

The theme underlying Madzia's argument appears to be that, because Madzia would receive minimal to no royalties from the oil and gas produced from the John Mills Wells, it would be unjust to allow Eclipse to drill wellbores through his property to use in conjunction with the John Mills Wells. But that is the agreement that Madzia made. In exchange for "the sum of One Dollar," royalties on certain oil and gas proceeds, free gas if certain conditions are met, and compensation for damage to his property, Madzia granted Eclipse a broad range of benefits that include the right to transport oil and gas from other lands via subsurface wellbores. Madzia cannot use an unjust enrichment claim to rewrite the terms of that agreement. *See, e.g., Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920 (1989).

The promissory estoppel claim fails for similar reasons. Madzia alleges that this claim is based on a promise purportedly set forth in the Subsurface Easement. Stated differently, Madzia argues that his interpretation of the Subsurface Easement contains a "promise," on which Madzia relied, that Eclipse would not drill wellbores through the Madzia Property in conjunction with any unit other than the Madzia Unit. To the contrary, it is black-letter law that a plaintiff cannot state a promissory estoppel claim when the subject matter of the alleged promise is the subject of a written agreement. *See, e.g., O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007). Because the subject matter of the alleged promise stems from the Subsurface Easement itself,

28

Madzia again cannot use an equitable claim to rewrite the terms of that agreement.

Madzia's argument that the Federal Rules of Civil Procedure allow him to plead alternative claims does not apply to the facts of this case.  This proposition of law applies only when the existence of an express contract is in dispute, *see id*; *Barnes v. First American Title Ins. Co*., No. 1:06CV574, 2006 WL 2265553, at *10 (N.D. Ohio Aug. 8, 2006), and no such dispute exists in this case.  Because the Court rejected Madzia's argument that Eclipse promised in the Subsurface Easement to limit its drilling of wellbores to those drilled in conjunction with the Madzia Wells, it necessarily rejects Madzia's argument that Eclipse made such a promise on which Madzia justifiably relied.

Madzia's final argument in support of these claims is that an express contract does not preclude recovery in equity when the defendant acted in bad faith.  Unfortunately for Madzia, "[t]he bad-faith exception is limited to bad faith in 'inducing the party into entering into the contract, or . . . in terminating the contract.' "  *White v. Wells Fargo Bank, NA*, 904 F. Supp. 2d 756, 767 (N.D. Ohio 2012) (quoting *Randolph v. New England Mut. Life Ins. Co.,* 526 F.2d 1383, 1387 (6th Cir.1975)).  Madzia makes no such allegations in this case.  His allegations that Eclipse acted in bad faith by exercising its rights under the Lease, therefore, do not save his unjust enrichment claim.  The Court accordingly **GRANTS** Eclipse's motion to dismiss Counts VI and VII of the counterclaim.

The Court reaches the same conclusion with respect to Madzia's tortious interference with prospective business relations claim (Count X).  Madzia's argument with respect to this claim relies on the premise that Eclipse "drill[ed] the John Mills Wells without Madzia's consent, [thereby preventing] Madzia from contracting with other oil and gas companies to drill

29

the John Mills Wells and other Wells through the Property."  (ECF No. 32, at PAGEID # 336–37.)  Because Eclipse was contractually entitled to drill the John Mills Wells, however, this claim necessarily fails.  The Court accordingly **GRANTS** Eclipse's motion to dismiss Count X of Madzia's counterclaim.

   **E.**  **Bad Faith Claims**

   In Count V of the counterclaim, Madzia asserts a claim for breach of the covenant of good faith and fair dealing of the Lease, the Amendment, and the Subsurface Easement.  Madzia alleges that Eclipse breached this duty by fracking the John Mills Wells before fracking the Madzia Wells, by including portions of the Madzia Property in the John Mills West Unit in bad faith ("bad-faith pooling"), by improperly recycling the Affidavit, and by drilling the John Mills Wells without contractual authority to do so.

   The Court already rejected the latter contention.  Because Madzia fails to link the Affidavit to any agreement, the Court likewise rejects Madzia's contention that he can pursue a claim for breach of the implied contractual duty of good faith and fair dealing on the ground that Eclipse presented the Affidavit to ODNR.

   Eclipse moves to dismiss only the portion of Madzia's remaining allegations that relate to bad-faith pooling.  The allegations regarding Eclipse's conduct in fracking the John Mills Wells before fracking the Madzia Wells are the subject of a subsequent motion for partial summary judgment.  *See* ECF No. 76, at PAGEID # 816.

   The Court agrees with Eclipse that Madzia's allegations of bad-faith pooling fail to state a claim for relief.  Outside of the insurance context, Ohio does not recognize a standalone claim for breach of the implied duty of good faith and fair dealing absent a valid breach of contract

claim.  *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009).  According to the

Sixth Circuit:

> Ohio law, which both parties agree is controlling, imposes an implied duty of good faith on parties to any contract. *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St.3d 433, 662 N.E.2d 1074, 1082–83 (1996). This duty requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 839 N.E.2d 49, 54 (2005) (quoting Restatement (Second) of Contracts, § 205 cmt. a (1981)). But the duty does not create an independent basis for a cause of action. *Thomasville Furniture Indus., Inc. v. JGR Inc*., 3 F. App'x 467, 472 (6th Cir. 2001) (referring to the covenant of good faith and fair dealing under Ohio law as a " 'salutary rule of construction,' not a basis for a cause of action") (quoting *Bolling v. Clevepak Corp*., 20 Ohio App. 3d 113, 484 N.E.2d 1367, 1376 (1984)).
>
> . . .
>
> [T]he implied duty of good faith cannot be breached by acting as allowed by the specific terms of the contract.

*Id*. at 476–77.  *See also Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St. 3d 433, 443–44,

662 N.E.2d 1074 (1996) (holding that the implied duty of good faith "is a compact reference to

an implied undertaking not to take opportunistic advantage in a way that could not have been

contemplated at the time of drafting and which therefore was not resolved explicitly by the

parties").

Madzia cites *Savedoff v. Access Group, Inc*., 524 F.3d 754, 764–69 (6th Cir. 2008), in

arguing that Ohio does recognize a stand-alone claim for breach of the duty of good faith.  The

*Savedoff* court did not contradict the *Wendy's* court on this issue.  The *Savedoff* court echoed the

Ohio Supreme Court's statements in *Ed Schory & Sons* when it stated: "If the contract is silent,

as opposed to ambiguous, with respect to a particular matter . . . [the parties] are required to use

good faith to fill the gap of a silent contract."  524 F.3d at 764.  Where a contract authorized a

party to collect interest on a loan, for example, but was silent as to how and when the party could do so, the party was required to collect the interest in good faith. *See id*. at 764–66.

This issues presented in this case do not involve a matter on which the agreements at issue are silent. To the contrary, Madzia argues that Eclipse acted in bad faith by pooling his property as the Lease and Amendment explicitly allowed it to do. Although Madzia cites authority in which another jurisdiction has recognized a claim for bad-faith pooling, it does not cite any persuasive authority suggesting that Ohio courts would do the same. The Court accordingly finds that the general rule set forth in *Wendy's* applies such that Madzia fails to state a claim for breach of the implied covenant of good faith and fair dealing. The Court **GRANTS** Eclipse's motion to dismiss this portion of Count V of the counterclaim. Because Eclipse's first motion for partial summary judgment is directed at the same portion of Count V, the Court **DENIES AS MOOT** that motion.

That leaves Madzia's allegation that Eclipse acted in bad faith by fracking the John Mills Wells before fracking the Madzia Wells in retaliation for Madzia's refusal to sign the John Mills Subsurface Easement. Eclipse addresses this allegation in a recently-filed motion for summary judgment. (ECF No. 76.) The Court will address the parties' arguments on this point once the motion is fully briefed.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Eclipse's motion to dismiss (ECF No. 26), **DENIES** Madzia's motion for partial summary judgment (ECF No. 37), **DENIES AS MOOT** Eclipse's motion for leave to file sur-reply (ECF No. 53), and **DENIES AS MOOT** Eclipse's motion for partial summary judgment (ECF No. 58). Only Eclipse's claims, the

portion of Count V of Madzia's counterclaim involving the order in which Eclipse drilled the

John Mills Wells and the Madzia Wells, and Madzia's counterclaims against the non-Eclipse

defendants remain pending in this litigation.

**IT IS SO ORDERED**.

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE