**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **ECLIPSE RESOURCES-OHIO, LLC,** *et al.*, : | |
| : | **Case No. 2:15-cv-00177** |
| **Plaintiffs/** : | |
| **Counter-Defendants,** : | |
| : | **JUDGE ALGENON L. MARBLEY** |
| **v.** : | |
| : | **Magistrate Judge Kemp** |
| **SCOTT A. MADZIA,** : | |
| : | |
| **Defendant/** : | |
| **Counter-Claimant.** : | |

**OPINION AND ORDER**

This matter is before the Court on the following motions: (1) the Third Motion for Summary Judgment (Docs. 139 & 140) of Plaintiffs/Counter-Defendants Eclipse Resources-Ohio, LLC and Eclipse Resources I, LP (collectively, "Eclipse"); (2) Defendant/Counter-Claimant Scott Madzia's ("Madzia") Motion for Partial Summary Judgment (Doc. 141); and (3) Defendant XTO Energy, Inc.'s ("XTO") Motion for Summary Judgment and/or Joinder in Motion of the Eclipse Entities' Motion for Summary Judgment. (Doc. 143.) For the following reasons, the Court **GRANTS** Eclipse's and XTO's Motions, and **DENIES** Madzia's Motion.

**I.     BACKGROUND**

**A. Factual Background.**

**1. Madzia and Eclipse Execute an Oil and Gas Lease, an Amendment to the Lease and a Subsurface Easement.**

This is a contract dispute concerning the rights and responsibilities of parties to an oil and gas lease. Madzia owns approximately 128 acres of real property in Stock Township, Harrison County, Ohio. (*See* Ex. A to Madzia's Mot. Part. Summ. J., Affidavit of Scott Madzia ("Madzia Aff.") ¶ 2; Answer, Doc. 8, ¶ 10.) On April 10, 2006, Madzia entered into an oil and gas lease

1

(the "Lease") with The Oxford Oil Company ("Oxford").  (Madzia Aff. ¶ 3; Ex. A to Eclipse's Third Mot. Summ. J., Deposition of Scott Madzia ("Madzia Dep.") at 35:30–23, Ex. 3.)  About three years later, on June 26, 2013, Madzia and Oxford executed an Amendment and Ratification of Oil and Gas Lease (the "Amendment"), which granted Oxford the right to pool Madzia's property with neighboring properties to create oil drilling units.  (*See* Ex. B. to Second Am. Countercl.; Madzia Dep. at 39:5–7.)  The Amendment obligates the lessee to "at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on [Madzia's property.]"  (Second Am. Countercl., Ex. B at 4.)  Eclipse assumed Oxford's rights and obligations under the Lease and Amendment in June 2013.  (*See* Madzia Aff. ¶ 3; Ex. B to Eclipse's Third Mot. Summ. J., 30(b)(6) Deposition of Christopher K. Hulburt, Esq. ("Hulbert Dep.") at 20:21–21:11.)

In December 2013, Eclipse constructed a well pad site on Madzia's property (the "Madzia Pad") and began drilling the Madzia Unit 2H, 4H, 8H and 10H wells (the "Madzia Wells") in or around March 2014.  (Second Am. Countercl. ¶ 14.)  In April 2014, Madzia and Eclipse entered into a subsurface easement agreement (the "Subsurface Easement") to provide Eclipse with subsurface horizontal drilling rights.  (*See id.* ¶ 16, Ex. C.)  When negotiating the Subsurface Easement, Madzia communicated to Eclipse via e-mail that the Subsurface Easement granted Eclipse rights only applicable to "the wells currently permitted and being drilled from this pad," which at that point, were the Madzia Wells.  (Madzia Aff. ¶¶ 12, 14; *see also* Second Am. Countercl. ¶ 17, n.3.)  Eclipse agreed to this condition, and the final, executed Subsurface Easement provided Eclipse the right to "drill a wellbore or wellbores across, through, and under the subsurface" of Madzia's property "in conjunction with drilling operations on the [Madzia Wells] . . . and for no other purpose or purposes whatsoever."  (Second Am. Countercl., Ex. C.)

2

Like the Amendment, the Subsurface Easement also requires Eclipse at its sole cost and expense to comply "at all times with all applicable federal, state and local laws, rules, regulations and safety standards in connection with [Eclipse's] activities hereunder." (*Id.*)

### 2. The John Mills and John Mills West Units.

In early 2014, Eclipse became the operator of four drilling units located north of Madzia's property. (Ex. D to Eclipse's Third Mot. Summ. J., Affidavit of Christopher K. Hulburt ("Hulburt Aff.") ¶ 4.) Eclipse consolidated these four units into the John Mills Unit and the John Mills West Unit. (*Id.* ¶ 5.) Eclipse determined that it would need another subsurface easement from Madzia to drill the John Mills West ("JMW") Wells from Madzia's property, and sought a second easement from Madzia in May 2014. (*See* Second Am. Countercl. ¶¶ 23, 25.) Madzia refused to execute a second subsurface easement without compensation. (*Id.* ¶¶ 26, 31.)

Thus, in a purported effort to work around the limitations of the Subsurface Easement, Eclipse pooled 0.517 acres of Madzia's property into the JMW Unit and began drilling operations on the JMW Wells from the Madzia Pad in June 2014, despite Madzia's objections. (*Id.* ¶¶ 32–33; Madzia Aff. ¶¶ 18–19.) Madzia contends that, although Eclipse had originally intended to frack the Madzia Wells first, Eclipse decided to begin fracking the JMW Wells (in which Madzia has a *de minimis* economic interest) before the Madzia Wells (in which Madzia has a substantial economic interest) to retaliate against Madzia for asserting his rights under the Subsurface Easement.[1] (Second Am. Countercl. ¶¶ 33–34.) According to Madzia, Eclipse has yet to frack the Madzia Wells. (*Id.* ¶ 34.)

---

[1] On September 3, 2014, Madzia's attorney sent a letter to Eclipse claiming that the Subsurface Easement prohibited Eclipse from drilling the JMW Wells from the Madzia Pad. (Compl. (Doc. 1) ¶ 26; Answer (Doc. 8) ¶ 26.) Eclipse notified Madzia on September 11, 2014 of its position that it had the right to do so under the Lease and Amendment. (Doc. 1 ¶ 28, Doc. 8 ¶ 28.)

### 3. Eclipse Recycles Madzia's Affidavit To Obtain Permits for the JMW Wells.

Under Ohio Revised Code Section 1509.05, Eclipse was required to obtain a valid permit issued by the Chief of the Division of Oil and Gas Resources Management of the Ohio Department of Natural Resources ("ODNR") in order to drill the JMW Wells. Ohio Rev. Code Ann. § 1509.05. On May 15, 2014, Eclipse submitted permit applications for several of the JMW Wells (Units 1H and 3H) to ODNR and requested expedited review of those applications. (Hulbert Aff. ¶ 6.) Eclipse intended to drill these wells from the Madzia Pad. (*Id.* ¶ 9.)

Section 1509.08[2] of the Ohio Revised Code sets forth the procedure for obtaining a permit from ODNR to drill an oil and gas well in a coal bearing township:[3]

> Upon receipt of an application for a permit required by section 1509.05 of the Revised Code, or upon receipt of an application for a permit to plug and abandon under section 1509.13 of the Revised Code, the chief of the division of oil and gas resources management shall determine whether the well is or is to be located in a coal bearing township.
>
> Whether or not the well is or is to be located in a coal bearing township, the chief, by order, may refuse to issue a permit required by section 1509.05 of the Revised Code to any applicant who at the time of applying for the permit is in material or substantial violation of this chapter or rules adopted or orders issued under it. The chief shall refuse to issue a permit to any applicant who at the time of applying for the permit has been found liable by a final nonappealable order of a court of competent jurisdiction for damage to streets, roads, highways, bridges, culverts, or drainways pursuant to section 4513.34 or 5577.12 of the Revised Code until the applicant provides the chief with evidence of compliance with the order. No applicant shall attempt to circumvent this provision by applying for a permit under a different name or business organization name, by transferring responsibility to another person or entity, by abandoning the well or lease, or by any other similar act.
>
> If the well is not or is not to be located in a coal bearing township, or if it is to be located in a coal bearing township, but the landowner submits an affidavit

---

[2] Section 1509.06(D) of the Ohio Revised Code enables an applicant to file a request for "expedited review of a permit application." If the expedited permit application applies to a well that will be located in a coal bearing township, the application must be accompanied by an affidavit of the type required by Section 1509.08 of the Ohio Revised Code. Ohio Rev. Code Ann. § 1509.06(D).

[3] It is undisputed that all municipalities within Harrison County, where Madzia's property is located, are coal bearing. (*See* Doc. 107 at 3 n.1.)

> attesting to ownership of the property in fee simple, including the coal, and has no objection to the well, the chief shall issue the permit.

Ohio Rev. Code Ann. § 1509.08. Essentially, the procedure set forth in the statute permits an affected coal owner to object to another entity's application to drill a proposed well. If the owner objects, "and if, in the opinion of the chief the objection is well founded, the chief shall disapprove the application and immediately return it to [ODNR] together with the reasons for disapproval and a suggestion for a new location for the well." *Id.* The applying entity can bypass this process if the coal owner submits an affidavit stating that he or she is the owner of the property (including the coal) and has no objection to the proposed well. *Id.*

In July 2013, Eclipse obtained an affidavit from Madzia (the "Coal Affidavit") stating that he owned the coal rights on his property and that he had no objections to Eclipse's drilling of the Madzia Wells. (Madzia Aff. ¶ 23; Ex. C to Eclipse's Third Mot. Summ. J., Deposition of Steve Opritza ("Opritza Dep.") at Ex. 17.) Eclipse submitted the Coal Affidavit in connection with its permit application for the Madzia Wells. (*Id.*) The Coal Affidavit contained no reference to the JMW Wells. (*See* Madzia Aff. ¶ 23.) But Eclipse also submitted the Coal Affidavit with its permit applications for the JMW Wells.[4] (*Id.* ¶¶ 20–24; *see also* Second Am. Countercl. ¶ 36.) Eclipse submitted the Coal Affidavit without Madzia's knowledge or consent. (Madzia Aff. ¶¶ 20–24.) ODNR issued Eclipse drilling permits for the JMW Wells on June 2, 2014, and Eclipse began drilling the JMW Wells shortly thereafter.[5] (*See* Hulburt Aff. ¶¶ 11–12.)

---

[4] Eclipse submitted the Coal Affidavit with non-expedited permit applications for several other JMW Wells in addition to Units 1H and 3H. (*See* Hulbert Aff. ¶¶ 7–8, 10.)

[5] Eclipse completed drilling operations on these wells in September and October 2014, and began fracking operations for the wells in early January 2015. (*See* Hulburt Aff. ¶¶ 13–14.) However, due to a downturn in market prices, and pursuant to a directive from Eclipse's Chief Operating Officer, Eclipse ceased all drilling operations on January 8, 2015. (Ex. E to Eclipse's Third Mot. Summ. J., Deposition of Oleg Tolmachev ("Tolmachev Dep.") at

Eclipse's use of the Coal Affidavit to obtain permits for the JMW Wells is the central issue in this action.  The parties do not dispute that Eclipse did indeed submit the recycled Coal Affidavit for the JMW Wells permit applications; what is at issue is only whether that submission was unlawful and therefore a breach of the Lease, Amendment and Subsurface Easement.

According to Eclipse, it submitted the Coal Affidavit with its permit application for the JMW Wells in reliance on the guidance of Patty Nicklaus, the ODNR employee responsible for reviewing all permit applications.  (*See* Doc. 140 at 19–20.)  In response to an inquiry from Eclipse about the permitting process, Nicklaus informed Eclipse via e-mail that "once you have received coal approval for at least one well on your pad, it follows that any future wells would have approval."  (Ex. J to Eclipse's Third Mot. Summ. J., Deposition of Patricia Nicklaus ("Nicklaus Dep.") at Ex. B.)  Based on Nicklaus's directive, Eclipse's understanding was that "once one well on the pad received a permit, whether through expedited review or non-expedited coal review, an operator could receive expedited review of all future wells drilled from the same pad without having to submit a new coal affidavit for each future well."  (Doc. 140 at 20 (citing Tolmachev Dep. at 121:4–17; Hulbert Dep. at 71:2–8).)  Thus, "because the Madzia Wells had already gone through expedited review, Eclipse believed it could obtain expedited review for the John Mills Wells without having to submit new coal affidavits because the wells would be drilled from the same pad."  (*Id.*)

Both Nicklaus and Steve Opritza, ODNR's permitting manager, testified in their depositions that Eclipse's understanding was indeed ODNR's practice at the time Eclipse submitted its permit applications for the JMW Wells.  (Opritza Dep. at 76:1–22, 95:1–7;

---

171:21–172:6.)  Madzia claims that Eclipse shut down operations to retaliate against him for asserting his rights under the Subsurface Easement.  (*See* Madzia's Opp'n to Eclipse's Third Mot. Summ. J., Doc. 148, at 10–13.)

Nicklaus Dep. at 35:18–36:14, 37:3–17.) Opritza also testified that Eclipse acted in good faith by submitting the Coal Affidavit with the JMW Wells permit applications. (Opritza Dep.at 89:7–13.) Further, ODNR's own documents show that since 2011, ODNR has issued approximately seventy permits using recycled affidavits like the Coal Affidavit.[6] (*See* Ex. K to Eclipse's Third Mot. Summ. J., Affidavit of Bronson Goss ("Goss Aff.").)

But Opritza also testified that Eclipse's submission of the Coal Affidavit to obtain permits for the JMW Wells violated the governing statutory provisions. (Opritza Dep. at 30:1–31:8, 129:15–24, 131:16–24, 134:3–6.) Additionally, Simmers testified at his deposition that Eclipse's submission of the Coal Affidavit to obtain permits for the JMW Wells was a violation of the statute and that Nicklaus's interpretation of the permitting process requirements was not ODNR's official interpretation.[7] (Simmers Dep. at 138:4–20.)

Further, when ODNR discovered in January 2015 that Eclipse had submitted the Coal Affidavit to obtain the JMW Wells permits, it demanded that Eclipse submit a new affidavit. (Second Am. Countercl. ¶ 39, Ex. J.) Eclipse then asked Madzia to execute a coal affidavit specifically for the JMW Wells, which he refused to do. (Madzia Dep. at 118:2–12.) Because Eclipse did not produce the requested coal affidavit, ODNR sent Eclipse a draft compliance agreement stating that Eclipse had violated Ohio Revised Code Sections 1509.06(D) and 1509.08, and on March 4, 2016, ODNR issued orders suspending Eclipse's operations of the JMW Wells. (Second Am. Countercl. ¶¶ 41–42, Exs. L & M; Madzia Aff. ¶ 27.) The suspension orders state that Eclipse is not operating the JMW Wells "in accordance with the

---

[6] Richard Simmers, Chief of the Oil and Gas Division of ODNR, testified at his deposition that he was unaware that ODNR had issued other permits based on recycled affidavits. (*See* Doc. 138, Deposition of Richard Simmers ("Simmers Dep.") at 61:14–62:6.)

[7] Nicklaus—the employee who responded to Eclipse's inquiry about the permitting process—is an office assistant at ODNR. (Simmers Dep. at 109:3–21.) It was Simmers' testimony that Opritza is "more knowledgeable" about the statutory permitting process than Ms. Nicklaus. (*Id.* at 109:3–16.)

7

requirements of R.C. 1509.06(D) and 1509.08." (Second Am. Countercl. ¶¶ 44–45, Exs. L & M.)

Ten days later, ODNR terminated the suspension orders after Judge Frost issued an opinion and order (Doc. 84) finding that Eclipse's use of the Coal Affidavit was not a violation of Ohio law. (Simmers Dep. at 98:5–24, Exs. F & G.) This Court reversed Judge Frost's ruling after discovering that it was based on "an incomplete, if not misleading, record." (Order, Doc. 107 at 9.) While ODNR has taken no further action against Eclipse since the termination of the suspension orders (*see* Simmers Dep. at 132:22–133:6), Richard Simmers, current Chief of the Oil and Gas Division of ODNR, stated that it is ODNR's current position that Eclipse "has been and [is] still violating the law by operating the [JMW] Wells." (Doc. 141 at 7 (citing Simmers Dep. at 117:11–118:4).)

### B. Procedural Background.

On January 20, 2015, Eclipse filed this lawsuit against Madzia, seeking damages for breach of contract and a declaratory judgment that it is entitled to drill the JMW Wells from the Madzia Pad. (Doc. 1.)[8] One month later, Madzia filed a ten-count counterclaim against Eclipse (Doc. 8), and amended his counterclaim in April 2015—bringing in additional parties, including XTO, but asserting identical causes of action. (*See* Doc. 25.)

On March 2, 2016, Judge Frost granted Eclipse's Motion to Dismiss Madzia's Amended Counterclaims. (Doc. 84.) Holding that Eclipse's use of the Coal Affidavit did not violate Ohio law, Judge Frost dismissed all but Eclipse's claims, a portion of Count V (breach of the covenant of good faith and fair dealing) of Madzia's amended counterclaim and Madzia's claims against

---

[8] Eclipse amended its Complaint on January 26, 2016. (Doc. 69.)

8

the non-Eclipse counter-defendants.[9] (*See id.* at 33.) In April 2016, Madzia moved for leave to file a second amended counterclaim, seeking to reassert claims related to Eclipse's use of the Coal Affidavit, based on newly discovered evidence. (*See* Doc. 92.) This Court granted Madzia's motion for leave to file a second amended counterclaim and vacated Judge Frost's prior finding that Eclipse's use of the Coal Affidavit was lawful. (Doc. 107 at 11.) Madzia then filed his Second Amended Counterclaim (Doc. 113) on July 22, 2016, asserting six causes of action.

On November 2, 2016, the Court dismissed three of Madzia's claims based on Judge Frost's prior rulings. (*See* Order, Doc. 134.) Eclipse now moves for summary judgment on the three remaining counts of Madzia's Second Amended Counterclaim: (1) Count III – Breach of the Lease, Amendment and Subsurface Easement; (2) Count IV – Breach of the Covenant of Good Faith and Fair Dealing of the Lease, Amendment and Subsurface Easement; and (3) Count VI – Injunction.[10] (Docs. 139 & 140.) XTO also moves for summary judgment, or in the alternative, to join Eclipse's Motion for Summary Judgment. (Doc. 143.) Finally, Madzia moves for "partial summary judgment as to liability" on Count III of the Second Amended Counterclaim, which alleges that "Eclipse breached [its] contractual obligation to comply with the law in drilling the John Mills West Unit 1H & 3H wells." (Doc. 141 at 1.) The parties' motions are fully briefed and ripe for this Court's review.

---

[9] All non-Eclipse counter-defendants other than XTO were voluntarily dismissed without prejudice in November 2015. (Doc. 57.)

[10] On December 5, 2016, Eclipse voluntarily dismissed without prejudice its Amended Complaint against Madzia. (Doc. 149.)

9

## II. LAW AND ANALYSIS

### A. Standard of Review.

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### B. The Coal Affidavit Claims

#### 1. Count III of the Second Amended Counterclaim – Breach of the Lease, Amendment and Subsurface Easement.

Under Ohio law, the essential elements of a cause of action for breach of contract are: (1) the existence of an enforceable contract; (2) the performance (or excuse from performance) of the contractual obligations by the party seeking relief; (3) breach or failure to fulfill contractual obligations by the other party; and (4) damages suffered by the party seeking relief as a result of the breach. *See Thomas v. Publishers Clearing House, Inc.*, 29 F. App'x 319, 322 (6th Cir. 2002) (internal citations omitted). Both Madzia and Eclipse move for summary judgment on Madzia's claim for breach of the Lease, Amendment and Subsurface Easement. The majority of the parties' briefing is centered on the third element: whether Eclipse breached its obligation under the Lease, Amendment and Subsurface Easement to comply with all applicable laws when it submitted the Coal Affidavit with its permit application for the JMW Wells.

Madzia argues that he is entitled to summary judgment on the issue of Eclipse's liability for breach because ODNR has concluded that Eclipse violated the law by submitting the Coal

11

Affidavit to support its permit application for the JMW Wells (as confirmed by the testimony of Simmers and Opritza), and that the Court is obligated to defer to ODNR's interpretation of Ohio Revised Code Sections 1509.06(D) and 1509.08.  (*See* Doc. 141 at 8 (citing Simmers Dep. at 107:13–108:8; Opritza Dep. at 30:1–31:8; 129:15–24).)  This Court has previously acknowledged that it must defer to ODNR's interpretation of the Ohio Revised Code "unless there are compelling indications that it is wrong."  (Doc. 107 at 9 (citing *Weiss v. Pub. Util. Comm'n*, 734 N.E.2d 775 (Ohio 2000)); *see also Smith v. Babcock*, 19 F.3d 257, 260 (6th Cir. 1994).

Eclipse contends that there are indeed compelling reasons to disregard ODNR's interpretation.  First, according to Eclipse, ODNR has not conclusively determined that Eclipse violated the law by submitting the Coal Affidavit with its permit application for the JMW Wells.  While Eclipse admits that ODNR suspended its operation of the JMW Wells, the suspension orders were voluntarily withdrawn ten days later and ODNR has taken no further action against Eclipse.  (*See* Eclipse's Mem. Opp'n Madzia's Mot. Part. Summ. J., Doc. 146 (citing Simmers Dep. at Exs. F&G).)  Moreover, Simmers admitted that ODNR is waiting until *after* this Court issues its decision to determine if Eclipse violated the law.  (Simmers Dep. at 132:22–133:6.)

Second, Eclipse argues that it was "ODNR's longstanding pre-Complaint practice to accept resubmitted coal affidavits," (Doc. 146 at 8), as evidenced by the nearly seventy permits it issued using recycled affidavits.  (*See* Goss Aff.)  Eclipse complied with this practice—in place at the time it filed the JMW Wells permit applications—in reliance on guidance from Nicklaus.  (*See* Nicklaus Dep. at 29:18–30:8; Tolmachev Dep. at 121:4–17; Hulburt Dep. at 71:2–8.)  Although both Simmers and Opritza testified that ODNR viewed Eclipse's submission of the Coal Affidavit with the JMW Wells permit applications as unlawful (Opritza Dep. at 30:1–31:8,

12

129:15–24, 131:16–24, 134:3–6; Simmers Dep. at 138:4–20), according to Opritza, this interpretation came into effect solely as a result of the dispute leading to this litigation. (Opritza Dep. at 95:20–96:1.)

In *Christopher v. SmithKline Beecham Corp.*, the Supreme Court opined that deference to an agency's interpretation of its own regulation is "unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," which may occur when "the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citations omitted). The guiding principle when determining whether to defer to an agency's interpretation of a regulation is that "agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." *Id.* at 2167 (internal quotation marks and citation omitted). Unfair surprise should be avoided at all costs. *See id.*; *see also Perez v. Loren Cook Co.*, 803 F.3d 935 (8th Cir. 2015). According to Eclipse, ODNR's post-litigation policy shift amounts to unfair surprise, and therefore this Court should not defer to ODNR's interpretation of Ohio Revised Code Sections 1509.06(D) and 1509.08 and whether Eclipse's conduct complied with those statutory provisions.

In rebuttal, Madzia argues that ODNR "did not espouse its interpretation of R.C. §§ 1509.06(D) and 1509.08 for the first time during this litigation. In fact, ODNR demanded that [Eclipse] supply a second coal affidavit for the [JMW] Wells before this case was even filed." (Doc. 154 at 2.) Additionally, although Madzia concedes that ODNR "previously approved well permits based on recycled permits," he argues that Eclipse could not rely on this,

13

because the "procedure did not reflect ODNR's *official* interpretation of R.C. §§ 1509.06(D) and 1509.08" (*id.* (emphasis added)), even though it was followed by multiple ODNR employees, including permitting manager Opritza. (*See* Simmers Dep. at 138:4–20.) Finally, regarding Eclipse's claim that ODNR has not yet made a final determination as to whether Eclipse violated Ohio Revised Code Sections 1509.06(D) and 1509.08, Madzia asserts that nothing about the statutory provisions is "tentative." (Doc. 154 at 2.) According to Simmers, the statutory provisions are "clear" that an affidavit is required to accompany a permit application (Simmers Dep. at 138:4–20); the only reason that ODNR is waiting to revisit the suspension orders is its preference that "private parties that are contesting an issue work the issue out between themselves." (*Id.* at 115:10–14.)

      The Court agrees with Eclipse that the Supreme Court's reasoning in *Christopher* applies here. Despite conflicting testimony about the lawfulness of Eclipse's use of the Coal Affidavit, it is undisputed that: (1) ODNR allowed the use of recycled coal affidavits on approximately seventy other occasions; (2) ODNR's permitting manager, Opritza, confirmed that it was ODNR's practice to accept resubmitted coal affidavits at the time that Eclipse submitted its permit application for the JMW Wells; and (3) Eclipse relied on guidance from Nicklaus in submitting the Coal Affidavit with its permit application for the JMW Wells. The record therefore reflects that Eclipse complied with ODNR's interpretation of the statutory permitting process in effect at the time it filed the JMW Wells permit application. It also reflects that, based on Opritza's testimony, ODNR did not take the position that Eclipse's conduct was unlawful until after it was notified by Madzia that he objected to Eclipse's use of the Coal Affidavit in December 2014—one month prior to the filing of this lawsuit. (Opritza Dep. at 95:20–96:1.)

Because ODNR's current interpretation of Ohio Revised Code Sections 1509.06(D) and 1509.08 "conflicts with its prior interpretation," and appears to be a "*post hoc* rationalization" ODNR adopted only after being questioned by Madzia, and because to subject Eclipse to liability based on ODNR's current interpretation would constitute unfair surprise, the Court declines to hold Eclipse liable for breach of the Lease, Amendment and Subsurface Easement.  *See Christopher*, 132 S. Ct. at 2166–67.

Madzia makes much of the fact that ODNR's practice of accepting recycled coal affidavits was not ODNR's "official" interpretation of the statute, and that ODNR's "official" interpretation of Ohio Revised Code Sections 1509.06(D) and 1509.08 has never changed.  (*See* Doc. 148 at 6; Simmers Dep. at 138:4–20.)  But Madzia does not cite case law in support of the proposition that there can be "official" and "unofficial" interpretations of agency regulations.  Even if he had, however, it would be difficult to argue that the practice approved by ODNR's *permitting manager*—which was, at the time Eclipse submitted the JMW Wells permit application, to accept recycled coal affidavits—was not the agency's "official" practice or interpretation of the permitting process.

While Simmers asserts that ODNR's "official" interpretation of the permitting process is reflected in the "clear" language of Ohio Revised Code Sections 1509.06(D) and 1509.08, it is noteworthy that Judge Frost, when interpreting this "clear" statutory language, found that "the statute . . . does *not* create a violation for submitting an affidavit expressing the landowner's consent to drill a *different* oil and gas well."  (Doc. 84 at 24 (emphasis added).)  Thus, even ODNR's so-called "official" interpretation of its regulation is subject to differing interpretations.  For these reasons, even if ODNR *had* definitively determined that Eclipse had violated the law by submitting the recycled Coal Affidavit, the Court is not obligated to defer to ODNR's current

15

interpretation of Ohio Revised Code Sections 1509.06(D) and 1509.08. ODNR's interpretation has been inconsistent, and imposing liability on Eclipse would constitute unfair surprise.

Further, Madzia cannot have it both ways. He cannot demand that Eclipse comply with the law by obtaining a second coal affidavit, and then refuse to provide that affidavit. The terms of the Amendment require Madzia to:

> promptly and duly execute and deliver any and all such further instruments, endorsements, agreements, consents, assignments and other documents (including, without limitation, driveway permits), make such filings, give such notices, and take such further action as may be deemed ***necessary or convenient*** to carry out the provisions of this Amendment and the Oil and Gas Lease.

(Second Am. Countercl., Ex. B at 7 (emphasis added).)

In order to carry out the provisions of the Lease and Amendment, Eclipse is required to obtain permits. *See* Ohio Rev. Code Ann. §§ 1509.06(D) and 1509.08. Madzia is therefore required under the Lease and Amendment to execute any documents that are "necessary or convenient" to Eclipse in obtaining those permits. Madzia acknowledges that he refused to execute a coal affidavit for the JMW Wells at Eclipse's request, after ODNR requested a new affidavit to support Eclipse's expedited permit application. (Madzia Dep. at 118:2–12.)

Madzia's argument that it was "entirely unnecessary" for him to execute a second coal affidavit because Eclipse "could readily obtain permits for the John Mills West Wells through the non-expedited permit process" wholly ignores the fact that he is contractually bound to execute documents that are deemed "***convenient***"—not just necessary. Thus, under the Lease and Amendment, Eclipse has the right to make the business decision to apply for an expedited permit because it is more convenient than utilizing the non-expedited process, and Madzia is obligated to aid Eclipse in that process. By refusing to execute a second coal affidavit, Madzia breached his contractual obligation to execute convenient documents under the Lease and

16

Amendment. Because "it is axiomatic that a party cannot benefit from its own breach" of a contract, Madzia's claim for breach of the Lease, Amendment and Subsurface easement fails for this additional reason, and Eclipse's motion for summary judgment on this claim is **GRANTED**. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) (internal citations omitted).

### C. Count IV of the Second Amended Counterclaim – Breach of Covenant of Good Faith and Fair Dealing of the Lease, Amendment and Subsurface Easement.

Madzia alleges that Eclipse breached the covenant of good faith and fair dealing of the Lease, Amendment and Subsurface Easement by: (1) submitting the Coal Affidavit to obtain permits for the JMW Wells; (2) engaging in bad faith pooling by including 0.517 acres of Madzia's property in the JMW Unit; and (3) retaliating against Madzia by fracking the JMW Wells before the Madzia Wells. (Second Am. Countercl. ¶¶ 74–77.)

As a threshold matter, the Court notes that Madzia's bad faith pooling claim was previously dismissed by Judge Frost, on the basis that the Lease and the Amendment "explicitly allowed" it. (Doc. 84 at 32; *see also id.* at 30–32.) The law of the case doctrine "provides that when a court decides upon a rule of law, that decision should govern the same issues in subsequent stages of the case." *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006) (internal citation omitted). Because Judge Frost has already dismissed Madzia's bad faith pooling claim, the Court cannot revisit it now.

With regard to Madzia's two remaining bad faith claims, Eclipse moves for summary judgment because under Ohio law, "a breach of the duty of good faith cannot stand alone as a separate cause of action, independent of the underlying claim for breach." *R.G. Barry Corp. v. Olivet Int'l, Inc.*, No. 2:15-CV-00826, 2016 WL 51228 at *7 (S.D. Ohio Jan. 5, 2016); *see also Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476–77 (6th Cir. 2009). Madzia relies on

17

*Savedoff v. Access Group, Inc.*, 524 F.3d 754 (6th Cir. 2008) to support his argument that there can be a standalone claim for breach of the duty of good faith if the contract does not explicitly address what is at issue between the parties.  (*See* Doc. 148 at 11); *Savedoff*, 524 F.3d at 764 ("If the contract is silent, as opposed to ambiguous, with respect to a particular matter . . . the parties to a contract are required to use good faith to fill the gap of a silent contract.") (internal citations omitted).

Here, the issues on which Madzia's two remaining bad faith claims are premised do not involve matters on which the Lease and Amendment are silent.  As discussed *supra* in Section (B)(1), the Court finds that Eclipse *has not* breached the Lease and Amendment by its submission of the Coal Affidavit.  Further, the Lease and Amendment address Madzia's obligations with regard to executing coal affidavits.  (Second Am. Countercl., Ex. B at 7.)  As for Madzia's claim that Eclipse retaliated against him in bad faith by fracking the JMW West Wells before the Madzia Wells, the Lease also addresses Eclipse's obligation (or lack thereof) to drill wells.  The Lease does not state that wells need to be drilled in a particular order because it does not require that wells be drilled at all.  In fact, under the Lease, Eclipse may "decline to drill a well or wells" at any time during the duration of the Lease.  (*Id.*, Ex. A.)

In sum, because Madzia's underlying breach claim fails, and because Madzia's bad faith claims are premised on issues addressed by the parties' written agreements, Eclipse's motion for summary judgment on Madzia's bad faith claims is **GRANTED**.

### D.  Count VI of the Second Amended Counterclaim – Injunction.

A party seeking a permanent injunction must "demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, in considering the balance of hardships between [the parties], a remedy in equity is warranted, and that it is in the public's interest to issue the

18

injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 551 (6th Cir. 2006) (internal citation omitted). The movant must establish its case by "clear and convincing evidence." *Wilkins v. Daniels*, 913 F. Supp. 2d 517, 533 (S.D. Ohio 2012).

Importantly, injunctive relief is a *remedy* afforded to parties in appropriate circumstances, *not* an independent cause of action. *Saha v. Ohio State Univ.*, No.05-CV-675, 2005 WL 2806318, at *3 (S.D. Ohio Oct. 26, 2005). The success of Madzia's injunction claim is therefore "dependent on the underlying merits of [his] other claims." *Id.* (quoting *Airbrake Sys., Inc. v. Mineta*, 202 F. Supp. 2d 705, 715 (E.D. Mich. 2002)). Accordingly, because Eclipse is entitled to summary judgment on Madzia's underlying claims for breach of contract and breach of the covenant of good faith and fair dealing, it is also entitled to summary judgment on Madzia's injunctive relief claim. Eclipse's motion for summary judgment on Madzia's injunctive relief claim is hereby **GRANTED**.

For the same reasons, Madzia's claim for injunctive relief against XTO must be dismissed. The only claim asserted against XTO in the Second Amended Counterclaim is Madzia's request for injunctive relief against the "John Mills West Interest Holders," a term defined to include XTO.[11] Because the injunctive relief claim is the only claim asserted against XTO, and injunctive relief is not an independent cause of action, Madzia's claim against XTO fails. Indeed, none of Madzia's summary judgment briefing even mentions XTO, and he has not opposed XTO's summary judgment motion. For these reasons, XTO's motion for summary judgment is **GRANTED**.

### III. CONCLUSION

For all of the foregoing reasons, the motions for summary judgment of Eclipse and

---

[11] The factual allegations against XTO in the Second Amended Counterclaim are essentially limited to jurisdictional information. (*See* Second Am. Countercl. ¶ 9.)

XTO are **GRANTED**.  Madzia's motion for partial summary judgment is **DENIED**.  Madzia's motion to dismiss his remaining counterclaims without prejudice (Doc. 157) is **DENIED** as **MOOT**.

      **IT IS SO ORDERED.**

                                                                 _s/Algenon L. Marbley_
                                                                 **ALGENON L. MARBLEY**
                                                                 **UNITED STATES DISTRICT JUDGE**

**DATED:  January 20, 2017**